

**USFC2011–3231–05**

{8AE63B36–02A5–442C–8BE5–FB634ACCE3EC}

{117665}{54–120823:113633}{081412}

# REPLY BRIEF (P)

WEST/CRS

2011-3231

# United States Court of Appeals
# for the Federal Circuit

U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT

FILED

AUG 1 4 2012

JAN HORBALY
CLERK

ROBERT J. MACLEAN,

*Petitioner,*

*v.*

DEPARTMENT OF HOMELAND SECURITY,

*Respondent.*

*Petition for Review of the Merit Systems Protection Board in
Case No. SF0752060611-1-2.*

## CORRECTED REPLY BRIEF OF PETITIONER

LAWRENCE A. BERGER
MAHON & BERGER
70 Glen Street
Suite 280
Glen Cove, NY 11542
(516) 671-2688
Fleoaatty@aol.com

THOMAS DEVINE
LEGAL DIRECTOR
GOVERNMENT ACCOUNTABILITY PROJECT
1612 K Street, NW, Suite 1100
Washington, DC 20006
(202) 457-0034
tomd@whistleblower.org

*Counsel for Petitioner*

JULY 27, 2012

# **TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES ...........................................................................iv

INTRODUCTION ...........................................................................................1

ARGUMENT ..................................................................................................3

I.    THE BOARD ERRONEOUSLY CONCLUDED THAT
MACLEAN DID NOT ACT IN GOOD FAITH WHEN HE
DISCLOSED SENSITIVE SECURITY INFORMATION.........................3

    A.    MacLean's comments of no regrets or remorse are not improper
for a lawful disclosure. ...........................................................................5

    B.    MacLean's comments that restricted status "did not matter"
concerned his warning to a supervisor about endangering the
public, not to a reporter. ........................................................................8

    C.    MacLean's alleged inconsistency between canceling FAM
coverage for Las Vegas versus national flights is an inaccurate
red herring. .............................................................................................9

    D.    MacLean's judgment that the TM was unrestricted was not
inherently incredible, and was shared by numerous DHS subject
matter experts .......................................................................................10

    E.    There was objective basis for MacLean's good faith mistake. ...........12

    F.    The AJ erred by not having any record basis besides testimony
from Mr. Donzanti, for whom the AJ erred by not making
credibility findings. .............................................................................13

II.    TERMINATION UNDERMINES THE EFFICIENCY OF THE
SERVICE. .............................................................................................15

III.    MACLEAN WAS TERMINATED IN RETALIATION FOR
PROTECTED FLEOA ADVOCACY........................................................23

IV.  MACLEAN'S TERMINATION VIOLATED THE
     WHISTLEBLOWER PROTECTION ACT ...............................................27

V.   DHS TERMINATED MACLEAN FOR VIOLATING
     REGULATIONS THAT DID NOT EXIST, AND FOR WHICH HE
     HAD NOT BEEN PROVIDED ADEQUATE NOTICE WHEN HE
     MADE HIS 2003 DISCLOSURE...............................................................30

CONCLUSION ........................................................................................32

CERTIFICATE OF SERVICE ...............................................................34

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE
REQUIREMENTS.................................................................................35

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*American Foreign Service Association v. Garfinkel,*
  732 F.Supp. 13 (D. D.C. 1990)..................................................................... 28, 30

*Anderson v. Dep't of Transportation,* FAA,
  827 F.2d 1564 (Fed. Cir. 1987) ...................................................................14

*Coons v. Dep't of Navy,*
  15 M.S.P.R. 1 (1983) ...................................................................................15

*Craft v. Dep't of Veterans Affairs,*
  78 M.S.P.R. 374 (1998) ...............................................................................14

*Geyer v. Department of Justice,*
  63 M.S.P.R. 13,
  *aff'd* 16 F.3d 1497 (Fed. Cir. 1997)..............................................................24

*Gilbert v. Department of Commerce,*
  194 F.3d 1332 (Fed. Cir. 1999) ...................................................................20

*Hillen v. Dep't of the Army,*
  35 M.S.P.R. 453 (1987) ...............................................................................14

*Juffer v. USIA,*
  80 M.S.P.R. 81 (1998) .................................................................................23

*MacLean v. Dep't of Homeland Security,*
  543 F.3d 1145 (9th Cir. 2008) ......................................................................3

*Valerino v. Dep't of Health and Human Services,* 7 M.S.P.R. 487, 490 (1981).....25

*Whitmore v. Department of Labor,*
  680 F.3d 1353 (Fed. Cir. 2012) ..................................................... 4, 10, 14, 25, 26

*Woebke v. Dep't of Homeland Security,*
  110 M.S.P.R. 100 (2010) .............................................................................16

**Statutes, Rules and Regulations**

First Amendment...................................................................................... 23, 26

5 U.S.C. § 2302(b)(8)(A)............................................................................22

5 U.S.C. § 2302(b)(8)........................................................................... 22, 29

5 U.S.C. § 2302(b)(10).......................................................................... 23, 26

49 C.F.R. § 1520.5(b)(8)(ii) (2004) ..........................................................31

49 C.F.R. § 1520.7(j) (2003).......................................................................31

Civil Service Reform Act of 1978 ..............................................................21

Whistleblower Protection Enhancement Act, S. 743, sec. 102(3); and HR. 3289,
    sec. 102(3).........................................................................................20


**Other Authorities**

124 *Cong. Rec.* S14302-03 (daily ed. Aug. 24, 1978).............................21

140 *Cong. Rec.* 29,353 ...............................................................................24

Congressional Research Service for "lack of specificity" and "lack of specific
    justifications for protecting transportation security information."
    http://www.fas.org/sgp/crs/RL32425.pdf, ............................................29

H.R. Rep. No. 103-769 ................................................................................24

S. Rep. No. 95-969, 95th Cong., 2d Sess., 12 (1978),
    *reprinted in* 1978 U.S. Code and Admin. News 2733, 2743................28

*The Whistleblowers: A Report on Federal Employees who Disclose
    Acts of Government Waste, Abuse and Corruption Prepared for the
    Senate Comm. On Governmental Affairs,* 95th Cong. 2d Sess., 49; S.
    Rep. No. 969, 95th Cong., 2d Sess. 8, *reprinted in* 1978 USCCAN
    272; 124 Cong. Rec. S14302-03 (daily ed., Aug. 24, 1978) .................21

*The New Webster's Comprehensive Dictionary of the English Language*
    1156 (Del. ed. 1985) .............................................................................11

# **INTRODUCTION**

The Department of Homeland Security ("DHS") brief ("DHS Br.") contends that intent is not an element in the case and Mr. MacLean must be terminated, because he intentionally disclosed Sensitive Security Information ("SSI") and created vulnerability in the process. It intricately analyzes three alleged inconsistencies to conclude MacLean was not credible, although his testimony never wavered from his belief that he had acted lawfully without releasing SSI. Since vulnerability was due to a conceded agency mistake that would have left the nation without Air Marshal protection during a planned terrorist attack, after congressional outrage the agency corrected its error before any damage was done. DHS concludes that is why MacLean's offense was so notorious that it had to terminate him: his disclosure forced the agency to shift resources.

This reasoning cannot co-exist with the record or the merit system. The alleged inconsistencies cannot withstand scrutiny, and there are no credibility determinations for DHS' only witness despite significant challenges to his independence and objectivity. Correcting a disastrous agency mistake before damage is done is an unacceptable basis to terminate a government employee. The Code of Ethics requires employees to act as public servants, and a basic merit systems principle is for them to make a difference for the public.

1

DHS rebuts MacLean's defense of retaliation for Federal Law Enforcement Officers Association ("FLEOA") activity by ignoring Federal Air Marshals Service ("FAMS") Director Thomas Quinn's almost unrestrained animus, and not recognizing the relevance of circumstantial evidence to prove retaliation. Further, it concedes termination was caused by a retaliatory investigation for MacLean's protected activity dissenting against Quinn's policies on national television. It offers no evidence supporting the AJ's erroneous distinction between the interview and FLEOA, one not shared by the agency.

DHS has not found authority to defend a new Merit Systems Protection Board ("MSPB" or "Board") loophole to protected public disclosures under the Whistleblower Protection Act ("WPA") -- when Congress requires agencies to prepare secrecy regulations. It has not rebutted extensive evidence that even if eligible to cancel WPA free speech rights, the SSI regulations are insufficiently specific for WPA statutory requirements. Even from the perspective of providing proper notice, they failed to include to the specific misconduct for which MacLean was terminated.

**ARGUMENT**

## I.    THE BOARD ERRONEOUSLY CONCLUDED THAT MACLEAN DID NOT ACT IN GOOD FAITH WHEN HE DISCLOSED SENSITIVE SECURITY INFORMATION.

DHS' contention is undisputed that its unauthorized SSI disclosure charge

does not include intent.  Nor did MacLean appeal the Ninth Circuit Court of

Appeals ruling that the TM constituted SSI.  But the court also held that "lack of

clarity" for the SSI regulations meant MacLean could contest whether his

termination does not serve the efficiency of the service, in part due to his "good

faith belief the information did not qualify as 'sensitive security information.'"

*MacLean v. Dep't of Homeland Security*, 543 F.3d 1145, 1152 (9th Cir. 2008).

Other than merit system violations, whether MacLean in good faith believed he

was acting lawfully is the dispositive issue the Ninth Circuit left for the Board.

The conclusion that MacLean knew he was acting illegally is the Board's

basis for upholding termination as the penalty, and it was based on credibility.

Contrary to DHS counsel's perspective that consistency is not an issue, DHS Brief,

at 27, the Administrative Judge ("AJ") rejected MacLean as "evasive, nuanced and

inconsistent," concluding in one instance that the record "belied" his testimony

about attempting to lawfully defend the country.  (A49-50).  He provided four

relevant bases: 1) in MacLean's affidavit to the Immigrations and Customs

Enforcement ("ICE") Office of Professional Responsibility ("OPR"), he expressed

"no remorse" and "no regrets" for his 2003 disclosure to NBC correspondent Brock Meeks; 2) MacLean said in a deposition that it does "not matter" whether his 2003 disclosure to Meeks included classified information; 3) he primarily acted out of frustration[1]; and 4) by revealing the cancelation of all FAM coverage MacLean inherently disclosed specific flight details -- his own definition for SSI. (A49, 50, 64).

The Board has not presented adequate support in the record either for its blanket credibility rejection, or specific examples supporting the conclusion. In *Whitmore v. Department of Labor*, 680 F.3d 1353, 1376 (Fed. Cir. 2012), this Court recently found the Board's findings on the agency's independent justification defense in a whistleblower appeal were not supported by substantial evidence:

> Any determination by an AJ that is based on findings made in the abstract and independent of the evidence which fairly detracts from his or her conclusions is unreasonable and, as such, is not supported by substantial evidence….Because considerable countervailing evidence was manifestly ignored, overlooked, or excluded, we must vacate and remand for consideration of all the evidence.

The same substantial evidence standards should apply for credibility determinations. Here, the AJ's credibility determinations for MacLean and the

---

[1] DHS concedes there is no inconsistency. DHS Br., at 28.

agency's only witness are similarly unsupported, as well as for penalty

determinations and accepted affirmative defenses.

     A.    <u>MacLean's comments of no regrets or remorse are not improper for a</u>
             <u>lawful disclosure.</u>

     The AJ contended, (A49-50), that MacLean's statement of "no remorse" and

"no regrets" to OPR "belied" his repeated testimony (and in the same OPR

affidavit) that, to his knowledge, he had acted lawfully and not disclosed any

"sensitive, secure or classified information" to unauthorized recipients.  (A130).

There is neither record basis nor rational explanation why the two positions are

either contradictory or dishonest.  In the same OPR statement MacLean explained:

"It is FAM policy that Sensitive Security Information will not be broadcast via

TMs to our Service issued mobile phones."  SA 28.  DHS counsel hypothesizes

scenarios where SSI regulations should not be controlling, and the Ninth Circuit

ultimately agreed SSI rules violations are not dispositive.  But MacLean's 2003

Meeks disclosure and 2005 OPR statement were years before that ruling.  It is not

incredible *per se* that, in 2003, MacLean thought marking and transmission

regulations were authoritative for information's status, and that he truly believed

he was acting lawfully. The AJ offered neither reasoning nor citations to support this analytical leap.[2]

That would be the case if MacLean's OPR "remorse/regrets" comment actually referred to the 2003 disclosure. It didn't. The OPR interview was about his 2004 television appearance. The 2003 disclosure was an aside that he volunteered to a catch-all question. The "remorse" remark was at the end of a supplement MacLean volunteered, (A241), before summarizing FLEOA's overall dissent and issues in the 2004 television interview: "setting up commercial aviation for catastrophic failure by violating the law, gross waste of funds, abuse of authority and overall gross mismanagement" by FAMS Director, Thomas Quinn, that identified undercover agents. That is the context for MacLean's "no remorse" statement immediately after. (SA 27-28). The whole record does not support a finding that the remarks reflected defiance about an unauthorized disclosure.

The Board's interpretation contradicts the record. The premise for lacking remorse was that media was necessary, because, inter alia, Congress had ignored his complaints. (SA 29). But MacLean's preliminary disclosures about

---

[2] MacLean was not rigid, and explained that with or without markings, release of information identifying individual agents or flights should be treated as SSI. (A244-50). Credibility is strengthened, because this perspective matches his subsequent FLEOA activities challenging Quinn's practices that exposed undercover agents – MacLean's perspective about mission necessities as well as SSI.

abandoning FAMS coverage in 2003 included no communications with Congress before going to Meeks. Unlike delayed support for his subsequent broader concerns, in 2003, numerous congressional offices supported him immediately, even saying he should be "thank[ed]." (A154).

Further, MacLean said his lack of remorse was because his disclosures "resulted in immediate and positive change in deadly FAMS policies." (SA29). That does not reference a single decision on coverage, but rather Quinn's overall practices exposing undercover agents (that MacLean had just listed) that were reversed after his and other Federal Law FLEOA representatives' disclosures. Indeed, while leading to correction of a coverage "mistake," the 2003 disclosure did not impact the overall misconduct MacLean and FLEOA successfully challenged in a sustained, subsequent campaign that included the NBC interview. There is no reason for remorse or regrets about the 2004 television interview or other FLEOA disclosures, both for which no misconduct is charged. They were legally protected and made a significant difference to better protect the public by exposing indefensible FAMS management breakdowns.

The Board misapplied MacLean's "no remorse and no regrets" phrase not only for credibility, but for whether termination supports the efficiency of the service. If the comment is so significant, the record should have been fully

7

developed for associated findings of fact. The AJ did not inquire at the hearing about the remark's implications or context.

B.    MacLean's comments that restricted status "did not matter" concerned his warning to a supervisor about endangering the public, not to a reporter.

Again without questioning at hearing, the AJ further rejected MacLean's protests of lawful intent because in deposition he allegedly said "it did not matter" whether the 2003 Meeks disclosure included classified information. Again, there is no record support. The transcript confirms that the out-of-context quotation referred to MacLean's protests to a *supervisor*, Roger Schofield, about the TM *they both had received*. MacLean explained that its status did not matter in that conversation, where he was seeking corrective action internally, because the law's requirement to cover Remain Overnight (RON) flights was being violated by canceling all such coverage, and public lives were at risk. (A283-84). That is not the testimony of a rogue employee taking the law into his own hands. While reiterating the out-of-context phrase, DHS does not dispute that MacLean was referring to discussions with his supervisor. The information's restricted status truly did not matter in context. The passage is irrelevant both to the charges against MacLean and to his credibility.

8

C.    MacLean's alleged inconsistency between canceling FAM coverage for Las Vegas versus national flights is an inaccurate red herring.

The only other relevant alleged inconsistency the AJ cited was hearing testimony where MacLean denied telling Meeks in 2003 that only Las Vegas flights were being canceled, contradicting his OPR statement. (A48). There is no basis in the record for this alleged contradiction, which understandably confused MacLean when pressed. His OPR-drafted statement did not say only Las Vegas flights were being canceled; it merely summarized, accurately, his personal knowledge: Las Vegas FAMs received the TM. (A130). Those two statements are not contradictory, so for MacLean there was no issue before signing the statement OPR investigators gave him. In fact, FAMS did not issue an order merely to cancel Las Vegas flights. That was not in the order that MacLean read to Meeks. The articles MacLean shared with OPR described national cancelation. (A135, 142). The subsequently-conceded "mistake" was canceling RON protection nationally. There is nothing on record that MacLean ever thought only Las Vegas FAMs were staying home, but other regions would continue protecting the public. He never did. His supervisor told him before the 2003 Meeks disclosure that every office in the country received the same Text Message. (A211). The point of his

disclosure was that FAMS planned to abandon RON flights nationally, not just in Las Vegas.[3]

There is no record basis for this distinction to be an issue, beyond speculative interpretation of a third-party sentence summarizing MacLean's interview. He did not say the order was limited to Las Vegas, he never believed it to be the case, and no media reports on the disclosure indicated any regional restriction involving Las Vegas.

### D.     MacLean's judgment that the TM was unrestricted was not inherently incredible, and was shared by numerous DHS subject matter experts.

Beyond credibility nitpicking, the three anecdotal disputes on alleged inconsistencies are immaterial to whether MacLean, in good faith, thought he was acting lawfully. DHS does not deny that, without exception, MacLean consistently

---

[3] When this became a surprise issue, MacLean moved to introduce the OPR interview transcript which proves the OPR investigators did not ask any questions on the 2003 Meeks disclosure, let alone whether it was national or regional. It also unequivocally indicates that the queries were about his 2004 television appearance, and the 2003 disclosures only came up at all because OPR had MacLean provide evidence of prior contacts. The Board erroneously declined, because: 1) MacLean had not introduced it previously; and 2) his intent is immaterial to liability. (A22). This alleged inconsistency had not been a disputed issue, however, and the transcript otherwise is duplicative with his statement. Its value is to correct a newly-introduced, out-of-context reference. The Board and DHS have found the alleged contradiction material for MacLean's credibility, whether termination furthers the efficiency of the service, and whether his actions were constitutionally protected. The transcript's context also makes clear that MacLean's "no remorse" remark referred to his 2004 television interview. Refusal to admit and consider this evidence substantially harmed and prejudiced MacLean. *Whitmore*, 630 F.3d at 1368-69.

testified that: 1) he did not think the information was SSI, because it did not disclose specific flight information, and 2) he thought he was acting lawfully. Instead, DHS explains that the real credibility issue is that MacLean's perspective was "irrational.... Mr. MacLean's assertion that he believed as much is, therefore, inherently incredible. That Mr. MacLean was consistent in asserting that implausible distinction [of blanket cancelation compared to specific flights] does nothing to undermine the Administrative Judge's credibility finding." DHS Br., at 27.

In support, DHS shares its agreement with the AJ's that every whole consists of individual parts, so by disclosing cancelation of all RON flights he was simultaneously disclosing details for each specific trip. In overview, that premise is not a given, even in the abstract. While zero may well be a specific, as observed by DHS, Resp. Br. at 19, the dictionary also defines it as "the absence of quantity,...nonentity[,]...[and] nonexistent." *The New Webster's Comprehensive Dictionary of the English Language* 1156 (Del. ed. 1985). A reasonable person might well not think "nonexistent" is synonymous with "particular" or "specific." On its face, this viewpoint does not render "incredible" MacLean's distinction and reasoning why the TM was unrestricted.

Nor does DHS dispute that MacLean's "irrational" views were shared by the consensus of national security experts in the record. Neither MacLean's supervisor

11

nor the OIG agent warned him about any restrictions connected with the TM. (A202-03, 211). Mr. Issman from ICE/OPR, who had responsibility to enforce against unauthorized leaks, was emphatic that he did not believe MacLean had disclosed SSI. (A115-17). The Employee Relations Special Agent in Charge thought the issue was uncertain. (A118-19). Even Mr. Donzanti conceded he would not have been sure. (A223-24).[4]

DHS' failsafe defense for rejecting MacLean's credibility is irrationality, not inconsistency. It contends consistency is insufficient, because "the administrative judge's credibility determination was based upon the implausibility of Mr. MacLean's stated belief" (DHS Br, at 27) of a legal distinction between general and specific flights. However, neither agency counsel nor the AJ questioned, challenged, or raised the whole/parts distinction at hearing, despite MacLean voicing it repeatedly. This fallback attack on his credibility is neither grounded in the record, nor valid when considered independently.

E.    There was objective basis for MacLean's good faith mistake.

MacLean's credibility about an honest error is reinforced by objective factors. While the AJ recognized that lack of markings and an un-restricted cell phone were relevant, he concluded MacLean still should have known better.

---

[4] This was one of several instances where Donzanti contradicted himself. He also said "any" FAM should have known, as "common knowledge." (A225).

While those were most obvious, the AJ did not consider the totality of objective factors that combined made MacLean's mistake reasonable. Indeed, he perceived it like a public "bullhorn." (A203). DHS does not dispute that his supervisor's lack of warnings about canceling coverage contrasted sharply with the tight security of prior emergency training. SSI requires a security plan, for which there was none. SSI not only must be marked, but there are tight controls for storage and destruction. Those controls did not come up when the message was sent or after. (A191, 196-201). It is undisputed that DHS cannot even find a copy of the TM it has characterized as sensitive to national security. It is error not to address these factors, which are material and relevant whether grounds existed for good faith error.

F.    The AJ erred by not having any record basis besides testimony from Mr. Donzanti, for whom the AJ erred by not making credibility findings.

DHS asserts that Mr. Donzanti's testimony provides record support that MacLean should have known the Text Message was SSI. But despite repeated challenges, there are no specific findings on challenges to Donzanti's credibility, and relevant supporting evidence was rejected. It is an inadequate basis to fill the record vacuum. DHS does not dispute that Board practice requires credibility determinations for a Deciding Official and only agency witness. The Board ignored that: 1) Donzanti gave contradictory testimony on numerous issues,

13

including whether an employee should have known the TM was SSI; 2) Donzanti's

actions treating MacLean as trustworthy contradicted his testimony; 3) Donzanti

was acting as a messenger who didn't edit and wasn't sure he had read before

signing the headquarters decisions on MacLean controlled by Mr. Quinn, who was

obsessively hostile and had a motive to retaliate, (A279-80); and 4) Donzanti had a

motive to cooperate with headquarters retaliation, because he had been caught

engaging in sexual harassment for which he was not investigated until after

Quinn's departure, when it led to his subsequent demotion.[5]  In short, in failing to

make credibility determinations for the agency's only witness the Board ignored

nearly all the factors for an adequate finding in *Hillen v. Dep't of the Army*, 35

M.S.P.R. 453, 458 (1987).

The standards to adequately assess credibility are clear.  DHS does not

dispute that isolated inconsistencies cannot justify a blanket rejection of credibility,

*Anderson v. Dep't of Transportation*, FAA, 827 F.2d 1564, 1570-71 (Fed. Cir.

1987); *Craft v. Dep't of Veterans Affairs*, 78 M.S.P.R. 374, 380 (1998).  As this

---

[5] While DHS agrees with the Board's rejection of evidence on Mr. Donzanti misconduct, it does not dispute that the personnel action did not occur until after the hearing.  MacLean attempted to introduce the relevant investigative record and personnel actions as soon as he learned of the developments.  The AJ and Board's refusal to accept and consider their relevance is harmful error that prejudices MacLean, since they raise an inference that Quinn shielded Donzanti from accountability in exchange for the latter acting as a rubber stamp for pretextual termination charges.

14

Court summarized in *Whitmore*, "It is error for the MSPB to not evaluate all the pertinent evidence in determining whether an element of a claim or defense has been proven adequately." 680 F.3d at 1368. That standard has not been met here. MacLean's isolated alleged inconsistencies cannot withstand scrutiny when considered in context and with both sides of the record. Moreover, the Board rejected evidence to resolve them unequivocally. MacLean's consistent, but allegedly "incredible" views, were shared by professional subject matter experts, and supported by the totality of objective factors. By contrast, the Board did not make any credibility findings about the only agency witness, despite challenges to his contradictions, objectivity and independence. It rejected evidence not available until after hearing that confirmed his bias.

## II.    **TERMINATION UNDERMINES THE EFFICIENCY OF THE SERVICE.**

Failing to assess Donzanti's credibility is also harmful error due to his role as the deciding official responsible to assess *Douglas* penalty factors. *Coons v. Dep't of Navy*, 15 M.S.P.R. 1, 5 (1983). Beyond a non-referenced, sweeping conclusion, the Board did not consider whether the stated reasons were pretexts for underlying bias, which Donzanti revealed by testifying he would have fired MacLean even if the disclosure were lawful. (A261). It also is not disputed that Donzanti's harsh penalty judgments flatly contradicted his actions toward

15

MacLean in the four month interim between release of the ICE/OPR statement and proposed termination, when he took no action to restrict MacLean's duties. (A221). The Board's failure to consider that factor also is error. *Woebke v. Dep't of Homeland Security*, 110 M.S.P.R. 100 (2010). Nor does DHS dispute that Donzanti failed to consider the rest of twenty-one listed *Douglas* factors for a responsible penalty determination. Instead, DHS emphasizes that MacLean's SSI release was worse than those of others who were merely suspended; that there is no potential rehabilitation due to his lack of remorse; and most fundamentally: the offense was so notorious that termination was the only option.

It is undisputed that no other FAM has been fired for making unauthorized SSI disclosures. DHS reiterates the AJ's conclusion that others, however, were not acting on official information, that the public could have panicked on a flight otherwise, or that only individual airline employees learned those disclosures. Resp. Br., at 38. But there is no response to MacLean's rebuttal that those offenses created greater risks, such as vulnerability to espionage. Nor does DHS dispute that the other disclosures involved personal gain, were part of multiple offenses; and did not include attempts to find alternatives.

DHS emphasizes that MacLean's disclosure was more dangerous because it involved more planes, somehow contending that disclosure of blanket cancelation identifies "specific planes to target." DHS Br., at 38. Beyond a self-rebutting

16

oxymoron, the argument ignores that MacLean's disclosures were *before* the agency's admitted mistake occurred, a warning with six days to correct it. Indeed, DHS did in fact correct the mistake before canceling coverage for two months until the end of the fiscal year. The others created vulnerabilities too late to correct, as well as more focused.

Considering potential for rehabilitation, DHS also reiterates that, because MacLean expressed no remorse and said the information's status did not matter, he would do it again. As discussed above, those out of context phrases referenced other disclosures to of non-SSI information on television, and to his supervisor, respectively, so are irrelevant for the charged 2003 Meeks disclosure.

Three points are uniquely relevant for the penalty. Initially, it is undisputed that Mr. Donzanti did not ask MacLean about remorse or willingness to do it again. That is necessary for a valid penalty judgment. Second, DHS insists that MacLean continues to express no remorse. That is untrue, as at hearing he expressed regret for harm to the agency's reputation, and pain for his family. (A285-86).

DHS rewrites the bottom line issue by insisting, "MacLean believes he was right to have disclosed SSI." Res. Br., at 37. Whether rationally credible or not, it is undisputed that, without exception, MacLean has said he did not believe he was disclosing SSI. In the same ICE/OPR "no remorse/regrets" affidavit, MacLean stated unequivocally that he had not disclosed SSI. (A130). He testified without

17

qualification that it is unacceptable to violate the law to defend it. (A205, 281).
This justification for termination comes from DHS, not the record.

Independent of all else, DHS contends MacLean's actions were so notorious
that termination was the only choice. Emphasizing that the end does not justify the
means, DHS argues that MacLean's actions did not make the public safer anyway,
because it eliminated the ability to bluff would-be hijackers. Resp. Br., at 31.
Most would agree that winning cards are preferable to bluffing. That questionable
premise further ignores that the agency agreed cancelation was a mistake,
corrected it to make the public safer, and would not have done so absent
MacLean's disclosure.

DHS also infers that MacLean only made Las Vegas flights safer at the
expense of the rest of the country, reminding that MacLean's duty is to the whole
country. Resp. Br., at 32-33. But the Las Vegas/national distinction only exists in
litigation disputes about translating an investigator's statement. In fact, the
cancelation and corrective action were national, as were the public safety benefits.

The fallback is that MacLean created vulnerability by warning Congress and
the public of the agency's mistake, indeed setting up the country for another 9/11.
But it is undisputed that the vulnerability was under DHS' control, and only would
occur if DHS declined to fix its mistake, which MacLean exposed. MacLean's
advance warning gave the agency time to act, and when confronted by an outraged

Congress, it immediately admitted to and corrected the error, ending the vulnerability.

What DHS and the Board ignore, however, is the net vulnerability if MacLean had remained silent. There is no dispute that a terrorist attack dwarfing 9/11 was ready to launch. It is undisputed that DHS was in the midst of suspending its Air Marshal defenses on the eve of the attack. Nor is there dispute that MacLean's acts prevented that scenario, at least for Las Vegas. It is unreasonable to consider the vulnerabilities from his disclosure, without considering the far more severe net vulnerability from the likely tragedy it made a difference preventing while there was still time.

DHS also reiterates Donzanti's explanation that MacLean was insufficiently knowledgeable to challenge management policy decisions. It adds that TSA couldn't complete its mission of protecting civil aviation if Air Marshals could publicly air their disagreements. Resp. Br., at 33-34. Those abstract challenges to public dissent again lose credibility and are superseded here, because the agency admitted it made a mistake. In this instance, public airing led to the agency resuming its protection mission, rather than abandoning it during a terrorist alert. MacLean was right, and his actions prevented implementation of a tragic mistake. Even if unquestioning obedience were a proper norm, there must be some exceptions.

19

However, the issue is still another red herring. MacLean was not fired for challenging the agency's judgment. He was terminated for making a disclosure to warn Congress and the public about its consequences – there no longer would be Air Marshal protection on long distance flights. As Congress recognized, this Court has distinguished between policy dissent and disclosure of a policy's consequences. S. Rep. 112-155, n.21, *citing Gilbert v. Department of Commerce,* 1999 U.S. App Lexis 5755.

DHS candidly explains the premise for insisting that MacLean had to go, for reasons more important than preventing a hijacking:

> Mr. MacLean argues that '[t]he primary difference with other SSI releases is that [his] actions exposed and led to correcting an agency mistake that prevented a government breakdown....That is not a difference that weighs in his favor, however....[T]he problem with Mr. MacLean's disclosure is that it was so serious it forced the agency to alter its plans. Rep. Br., at 38-39.[6]

In other words, the primary reason MacLean had to go is that he made a difference correcting an agency mistake, and that offense was more significant than restoring protection for the nation during the most ambitious planned terrorist attack in history.

---

[6] DHS no longer defends the AJ's rationale that undermining public confidence by exposing the agency's mistake was worse than leaving it uncorrected would have been.

This premise is incompatible with the merit system. The point of those rights is to create a human failsafe when normal channels break down. That is the principle behind enactment of merit system rights generally, and whistleblowing in particular. As previously discussed in-depth, that also is the cornerstone of the Code of Ethics for Government Service: a government employee's primary duty is to the public, not an agency. PL 96-303, 94 Stat. 855 (July 3, 1980). *See generally The Whistleblowers: A Report on Federal Employees who Disclose Acts of Government Waste, Abuse and Corruption Prepared for the Senate Comm. On Governmental Affairs,* 95th Cong. 2d Sess., 49; S. Rep. No. 969, 95th Cong., 2d Sess. 8, *reprinted in* 1978 USCCAN 272; 124 *Cong. Rec.* S14302-03 (daily ed., Aug. 24, 1978); 124 *Cong. Rec.* S14302-03 (daily ed. Aug. 24, 1978). Congress enacted the Civil Service Reform Act of 1978 in part to make the Code relevant. Although it is on the wall in every government agency office, neither DHS nor the Board has recognized the Code's existence in this appeal.

It is undisputed that MacLean acted in good faith to protect the country. Despite unrestrained red herrings, there is no credible rebuttal in the record that, right or wrong, MacLean intended to act lawfully and thought he was acting lawfully. Nor is there dispute that he made a difference, and nothing in the record suggests its impact was parochial for Las Vegas at the rest of the country's expense. While it also is undisputed that MacLean was wrong about the TM's SSI

21

status, even absent prohibited personnel practices, decisions on the efficiency of the service must be consistent with merit system principles and the Code of Ethics.

If there were any doubt about the pretextual nature of the notoriety issue, it is resolved by the President's Executive Order on Controlled Unclassified Information. ("CUI"). On November 4, 2010, the President signed EO 13556 on the new category of CUI for SSI, among some 100 hybrid secrecy categories. As detailed in the congressional *amicus*, at 16-18, its Statement of Purpose explains the EO's necessity: an "inefficient, confusing patchwork" of rules on document marking and safeguarding that has caused "unclear or unnecessarily restrictive dissemination policies, and created impediments to authorized information sharing." Most significant, section 2(b) specifies, "The mere fact that information is designated as CUI shall not have a bearing on determinations pursuant to any law requiring the disclosure of information or permitting disclosure as a matter of discretion…." The free speech provisions in 5 U.S.C. § 2302(b)(8)(A) fall within the latter category. In short, far from being so notorious that disclosure of SSI requires termination, under the Executive Order SSI disclosure now is insufficiently notorious for any liability.

## III.  **MACLEAN WAS TERMINATED IN RETALIATION FOR PROTECTED FLEOA ADVOCACY.**

The AJ permitted MacLean to allege affirmative defenses under 5 U.S.C. § 2302(b)(10) for discrimination due to membership and activities in an outside organization, FLEOA, and section 2302(b)(11) for his retaliation due to associated exercises of free speech during his FLEOA advocacy.  It is undisputed that his FLEOA membership and activity are protected, and that associated disclosures were matters of public concern protected by the First Amendment.  However, the AJ arbitrarily, and erroneously, segregated the interview from FLEOA activities. DHS has not rebutted MacLean's testimony that the 2004 NBC television interview was part of his FLEOA advocacy.  Indeed, FLEOA was referenced in the Conduct Incident Report seeking an investigation of the television interview. (A127).[7]  Nor is it contested that the retaliatory investigation of MacLean was because of his television interview.  In fact, the AJ found that nexus, (A55), which DHS has cited with approval.  Resp. Br., at 41.

DHS' rebuttal is to contend that civil service law only bars subsequent action for the original issues used to justify opening the investigation. Resp. Br., at 42-43.  There is no authority for this astounding assertion, which would leave

---

[7] For purposes of retaliation, the perception of protected activity is equivalent to actual protected conduct. *Juffer v. USIA,* 80 M.S.P.R. 81, 86 (1998).

employees defenseless against illegal fishing expeditions, so long as the original

pretext is discarded.  That reasoning is consistent with the Board's and this court's

action in *Geyer v. Department of Justice*, 63 M.S.P.R. 13, *aff'd* 16 F.3d 1497 (Fed.

Cir. 1997), *cert. denied*, 522 U.S. 1032; *Geyer v. Department of Justice*, 70

M.S.P.R. 682, 689 (1998), an investigation was reviewed to determine if resulting

charges, including those based on new allegations, were pretextual to lay

groundwork for another action.  The prohibition of retaliatory investigations cannot

shield the merit system, unless it invalidates all subsequent actions that are fruits of

the violation.  Congress created protection from retaliatory investigations because

they are a prelude or precondition for more conventional reprisals.  140 *Cong. Rec.*

29,353 (Statement of Rep. McCloskey), and H.R. Rep. No. 103-769, at 15.  This is

because Congress' objective was to ban harassment "that is discriminatory, or

could have a chilling effect on [the] merit system...."  140 *Cong. Rec.* 29,353

(Statement of Rep. McCloskey).  It would maximize the chilling effect if illegal

probes based on one issue can be open-ended Pandora's Boxes to investigate in a

discriminatory manner against agency whistleblowers until evidence is found to

justify termination.

It also would not square with the facts in this appeal.  The agency was

inactive on the SSI disclosure until MacLean raised it to OPR.  The agency's

obsessive focus was on FLEOA, and it viewed the television appearance in that

24

context. DHS reiterates the Board's observation that there is no direct evidence of FLEOA retaliation, and insists MacLean has not cited to the record for direct evidence of animus. Resp. Br., at 42. In fact, however, the evidence could not be more direct. The stated motivation for headquarters Policy Compliance Unit investigations of MacLean (even his family) and repeatedly seeking OCE/OPR investigations was because of protected FLEOA activity.

Further, DHS ignores long-established case law that retaliation claims can be demonstrated through *circumstantial evidence*. *Valerino v. Dep't of Health and Human Services*, 7 M.S.P.R. 487, 490 (1981). As this Court explained in *Whitmore*, "Since direct evidence of ... retaliatory motive is typically unavailable (because such motive is almost always denied), federal employees are entitled to rely on circumstantial evidence to prove motive to retaliate." 680 F.3d at 1371.

DHS does not contest that extensive record citations demonstrate animus, motive to retaliate, expressions of hostility, stakes of disclosure, and impact of the disclosure, which are relevant circumstantial evidence factors. FLEOA leaders Terreri and MacLean were publicly challenging Quinn's policies, and gaining congressional support. He responded by publicly branding them as "disgruntled amateurs," "insurgents", and "organizational terrorists." (A116, 175). In one request for an ICE/OPR investigation, Quinn personally attacked MacLean and FLEOA President Frank Terreri, both targeted for investigation, as "disgruntled,"

25

"malicious," "obscene," "irresponsible," "abusive," and part of a "de facto labor organization," based on their FLEOA activities. (A116, 177-80). The AJ, Board, and DHS have not made any references to Quinn, let alone his retaliatory animus and critical role controlling the campaign against FLEOA leaders.

That animus could be imputed to Donzanti, even if he were not vulnerable to Quinn based on sexual harassment charges the latter was not acting on. As this Court held in *Whitmore*, it is unnecessary for the Deciding Official personally to have animus if higher level agency managers are closely following and concerned about an employee's disclosures. 680 F.3d at 1363. That is especially relevant here, where the same Headquarters Policy Compliance Unit that reported to Quinn and conducted preliminary retaliatory investigations of MacLean, also drafted the termination letter that Donzanti signed. (A279-80).

Both with respect to a violation of section 2302(b)(10) and the First Amendment, protected activity must be balanced against impact on performance of job duties and government efficiency. DHS' primary argument is that the benefits are outweighed because MacLean's disclosure forced the agency to shift its resources. While the proper balance has been discussed with respect to the efficiency of the service, one factor is dispositive for the constitutional balancing test. The agency had made a mistake that would leave America without its Air Marshal defense during a terrorist attack, the attack was prevented, and the mistake

26

would not have been corrected but for MacLean's exercise of First Amendment rights. More than the efficiency of the service in isolation, the constitutional balancing test weighs heavily in favor of correcting the mistake.

## IV.   MACLEAN'S TERMINATION VIOLATED THE WHISTLEBLOWER PROTECTION ACT

This error would rewrite statutory language to institutionalize an unacceptable chilling effect. DHS does not deny that the WPA's purpose is to provide teeth for the Code of Ethics, and to encourage disclosures of government breakdowns that otherwise would undermine its public mission. It does not dispute repetitive, unqualified legislative history conclusions that only Congress can create exceptions to WPA free speech rights for public disclosure. It does not contest that the supremacy of statutory free speech rights over contrary agency regulations was a fundamental choice during enactment of Civil Service Reform Act whistleblower provisions. It does not contest that permitting Congress to delegate its responsibility to agencies violates basic statutory construction canons by partially restoring deleted language without any supporting reference from Congress, and renders statutory language superfluous that seven times made a point to distinguish statutory "law" from agency "rules and regulations." MacLean Initial Brief, at 52-58.

Instead, DHS repeatedly asserts there is no reason why Congress cannot delegate its statutory authority to create WPA exceptions. Resp. Br., at 47-49. It offers no authority, merely ignoring all contrary statutory construction doctrines and precedents. Of course Congress could have delegated that function, but it had to actually make and communicate the decision. DHS has not offered any authority that it did, or that other institutions can replace Congress and amend its boundary for the statutory right to warn the public of government breakdowns.

DHS also concedes that restrictions must be specific in legislative enactment, and that the Aviation Transportation Act is the baseline here. But it asserts the ATA satisfies legislative history with sufficient specificity by its reference to safety. Resp. Br., at 46-47. DHS skipped the rest of the legislative history requirement, however, that disclosure bans must identify specific documents, or provide sufficient criteria so that there is no discretion. S. Rep. No. 95-969, 95th Cong., 2d Sess., 12 (1978), *reprinted in* 1978 U.S. Code and Admin. News 2733, 2743. DHS also does not rebut that the lack of requirement for markings creates inherent uncertainty on how to interpret statutory language as broad as "classifiable" speech restrictions banned as unconstitutionally vague for over two decades. *American Foreign Service Association v. Garfinkel*, 732 F.Supp. 13 (D. D.C. 1990).

DHS contends that MacLean seeks to bar Congress from ordering agencies to protect information. He has made no such claim, but only Congress can revise section 2302(b)(8) to exclude new scenarios from the scope of its protection. It has not chosen to do so.

Even if Congress could delegate with specificity, the SSI regulations do not qualify. DHS does not contest that all government assessments have concluded they are confusing, inefficient, inconsistent, and criticized in 2004 by the Congressional Research Service for "lack of specificity" and "lack of specific justifications for protecting transportation security information." http://www.fas.org/sgp/crs/RL32425.pdf, at 7. That is why the CUI Executive Order was issued.

There is not a scintilla of authoritative basis, in statutory language, legislative history, rules of statutory construction, or precedent, supporting congressional delegation of its sole authority to determine free speech exceptions; or to hold that regulations generally conceded as confusing meet the statutory standard that employees should not have to exercise discretion whether information's release is prohibited.

## V.    DHS TERMINATED MACLEAN FOR VIOLATING REGULATIONS THAT DID NOT EXIST, AND FOR WHICH HE HAD NOT BEEN PROVIDED ADEQUATE NOTICE WHEN HE MADE HIS 2003 DISCLOSURE.

DHS does not disagree that MacLean was entitled to be charged with offenses that actually existed when he was accused of violating them, as well as meaningful notice of his liability. However, it contends that new regulations do not matter, since the substance was identical. DHS Br., at 19-25. The Board goes further, holding that he could be fired for disclosing "sensitive" information even if not SSI. No contrary case law is offered for the controlling legal principle, including the Board's assertion that sensitivity and misconduct similar to illegality are constitutionally sufficient grounds for removal. That boundary for liability is inconsistent with *Garfinkel*, 732 F.Supp. 13, on unconstitutional vagueness and over-breadth grounds.

Without reiterating un-rebutted authority, accountability for precision on what constitutes SSI must be a two way street. MacLean is being fired for almost hair splitting distinctions on what constitutes "specificity." If DHS holds its employees to precise command of SSI boundaries, it is equally accountable. There were two sets of regulations prohibiting unauthorized SSI releases, one before and one after MacLean's disclosure. DHS asserts it does not matter which MacLean was fired for violating, because they both forbid SSI releases. It overlooks, however, that the 2004 regulation changed the meaning of what SSI constitutes.

The 2003 disclosure banned specific details for deployments and FAMS. 49 C.F.R. § 1520.7(j) (2003). The 2004 regulations used to terminate MacLean expanded the ban to more broadly encompass "operational and technical" information, which more reasonably includes a coverage ban. 49 C.F.R. § 1520.5(b)(8)(ii) (2004). Quite simply, they are not identical. DHS offers no authority that an employee can be terminated for violating what years after the fact it considers equivalent rules to those in effect at the time. There are limits to ex post facto liability, and that is why the Ninth Circuit remanded to consider good faith error for liability, even if agency violation of its SSI rules did not change the information's restricted category.

Nor does DHS reference a scintilla of support in the record that MacLean's training provided any guidance on how many SSI rules can be violated before information stops becoming SSI. In this instance the rules on marking, transmission, control, storage, and disposal all were violated, but DHS contends that does not matter. The anomaly again illustrates why the CRS rejected the SSI regulations as confusing and dysfunctional, why the Ninth Circuit said there were grounds for confusion, and why the EO was issued. But the implications go beyond confusion. It is error to terminate an employee for violating rules that did not exist, and to omit notice of how many agency violations of SSI rules must occur before information loses that status.

31

## **CONCLUSION**

If MacLean's good faith were the only relevant issue for this appeal, the case should be remanded. The AJ's selective, strained excerpts must be balanced against the whole record. Equally significant, credibility determinations need to be made for Donzanti, the agency's only witness, including review of the evidence erroneously excluded. Remand also is necessary for adequate review of penalty factors, including the criteria to assess the efficiency of the service. Remand should be unnecessary, however. It is undisputed in the record that MacLean was terminated from evidence in an investigation opened because of protected activity. It is undisputed in the law that the agency's SSI regulations cannot override his Whistleblower Protection Act rights. The Board's decision below should be reversed.

Respectfully submitted,

Lawrence A. Berger
General Counsel
Federal Law Enforcement Officers
    Association
MAHON & BERGER
70 Glen Street, Suite 280
Glen Cove, NY 11542
(516) 671-2688
Telephone: 516-671-2688
Facsimile: 516-671-1148
Email: FLEOAatty@aol.com

Thomas Devine
Legal Director
Government Accountability Project
1612 K Street, NW, #1100
Washington, DC 20006
Telephone: 202-457-0034, ext. 124
Facsimile: 202-457-0059
tomd@whistleblower.org

**United States Court of Appeals
for the Federal Circuit**

*MacLean v DVA*, No. 2011-3231

## CERTIFICATE OF SERVICE

I, Elissa Matias, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by MAHON & BERGER, Attorneys for Petitioner, to print this document. I am an employee of Counsel Press.

On the 27th **Day of July, 2012,** I served the within **CORRECTED REPLY BRIEF FOR PETITIONER** upon:

> Michael Goodman, Trial Attorney
> Todd M. Hughes, Deputy Director
> Jeanne E. Davidson, Director
> Stuart F. Delery, Acting Assistant Attorney General.
> U.S. Department of Justice
> P.O. Box 480, Ben Franklin Station
> Washington, DC 20044
> (202) 305-2087 - Tel
> (202) 514-8640 - Fax
> Michael.Goodman@usdoj.gov

**via Express Mail,** by causing 2 true copies of each, enclosed in a properly addressed wrapper, to be deposited in an official depository of the U.S. Postal Service.

Unless otherwise noted, 12 copies have been sent to the Court on the same date as above via Federal Express.

July 27, 2012

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  __X__  The brief contains <u>6,996</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  __X__  The brief has been prepared in a proportionally spaced typeface using <u>MS Word 2007</u> in a <u>14</u> point <u>Times New Roman</u> font or

____ The brief has been prepared in a monospaced typeface using <u>MS Word 2002</u> in a ___ characters per inch_____ font.

<u>July 27, 2012</u>_____                          *Thomas Devine*

                                        Thomas Devine
                                        Attorney for Petitioner